WOODRUFF COUNTY (CULVER v.). See Case No. 3,469.

WOODRUFF, The F. See Case No. 6,763.

WOODRUFF, The J. W. See Case No. 5,770.

=====

## Case No. 17,990.

### In re WOODS.

[7 N. B. R. 126; 29 Leg. Int. 236; 20 Pittsb. Leg. J. 21.] [1]

District Court, E. D. Pennsylvania. 1873.

ACTS OF BANKRUPTCY—NEGOTIABLE PAPER—SUSPENSION OF PAYMENT—PROCUREMENT OF JUDGMENT.

1. The owner of oil lands, who divides it into leaseholds and receives the rent in oil, is not a trader within the meaning of the bankrupt law [of 1867 (14 Stat. 517)], inasmuch as he deals only in the products of his land. Hence, he does not commit an act of bankruptcy by any suspension of payment of his negotiable paper for a period of fourteen days, however multiplied the transactions of his business through the leases, and however extended his credits. [Cited in Gardner v. Cook, Case No. 5,226.]

2. Although the assets of a debtor may be rightly estimated at four times the amount of his debts, yet he is insolvent if unable to meet his engagements as they accrue and become due.

3. The procuring or suffering a judgment to be obtained against him by a debtor, without giving any warrant of attorney, is not in itself an act of bankruptcy; yet, if he directly or indirectly assists or facilitates the obtaining of judgment on which an execution has followed, this may be evidence in support of an allegation that he has committed an act of bankruptcy by procuring or suffering his property to be taken in execution.

G. H. Vanzant and J. M. Moyer, for creditors.

L. R. Fletcher, G. W. Wollaston, G. S. Selden, and Mr. Woods, for debtor.

[1] [Reprinted from 7 N. B. R. 126, by permission. 20 Pittsb. Leg. J. 21, contains only a partial report.]

30 Fed.Cas.—34

CADWALADER, District Judge (charging jury). We are living in an extraordinary age, and there has not often occurred a more striking example of the good or evil spirit of the age than this case. Here is a gentleman who seems to be unable to pay his creditors their dues, but who was in the year eighteen hundred and sixty-nine in such a condition that he paid an income tax on one hundred and sixteen thousand dollars. In less than two years we find his note for the small amount of one thousand four hundred dollars discounted for his own accommodation at two per cent. a month; and we find all his corporeal moveable effects at the place where he resides, sold by the sheriff for less than one thousand three hundred dollars. If he has committed an act of bankruptcy, there perhaps never was a case requiring more urgently the application of the salutary principles of the bankrupt law. The most salutary tendency of this law is to prevent overtrading. In this respect its operation will be gradual, but must be highly beneficial. When relations and friends of a debtor, and when capitalists who, without affection or friendship, would make profit from his embarrassments, learn that they cannot be secured a preference out of the wreck of his affairs, they will not furnish him the means of overtrading. So long as he could, by securing advances and accommodations, obtain them, the temptation to attempt to retrieve his losses, by doubling his investments, was, before the enactment of the bankrupt law, irresistible; and the system of business was that of mere gambling adventure. But when a debtor who suffers losses knows that he cannot prefer his relations and friends, and when capitalists know that they cannot, without risk, assist him to the injury of other creditors, he will stop his business in season to give a fair dividend to all his creditors, and thus make a fair settlement with them in the court of bankruptcy, or much oftener out of it. Thus, in the course of time, few judicial bankruptcies will occur. If this gentleman has been assailed by misfortune, or has suffered disappointment without any fault of his own, and if he rightly estimates the ultimate value of his assets at four times the amount of his debts, he nevertheless admits his inability to meet his engagements as they accrued and became due. He was therefore insolvent, within the meaning of the bankrupt law. It is true, as his counsel urge, that he was under no obligation to file a voluntary petition in bankruptcy. But if he has committed an act of bankruptcy he is liable to be made a bankrupt involuntarily, and it is, in that case, the right of his creditors that his estate should be administered in the court of bankruptcy. Either the bankrupt law should not exist, or it should be thus applied. Otherwise creditors may starve while their debtor is building castles in the air. This, and other general suggestions which I have

made, may or may not be material to the decision of this case. It is for you, as men of business, to determine their materiality or immateriality.

One of the alleged acts of bankruptcy is, that this debtor has, within the meaning of the thirty-ninth section of the bankrupt law of second of March, eighteen hundred and sixty-seven, as amended by the act of congress of fourteenth of July, eighteen hundred and seventy, "suspended and not resumed payment of his commercial paper within a period of fourteen days." It is admitted that he suspended payment of his negotiable paper, and that it remained unpaid more than fourteen days before the commencement of proceedings in bankruptcy. But the laws on the subject have not made this an act of bankruptcy unless he was "a banker, broker, merchant, trader, manufacturer or miner;" and the question discussed by counsel has been, whether he was a trader within the meaning of these laws. On this point, considering the magnitude, multiplicity, and commercial semblance of his transactions, I have had great difficulty; and, if I have mistaken the law, I hope that my opinion will be carefully revised hereafter. My first impression was, that he was a trader, or that there was evidence from which you might find him to have been one. He had divided fifty acres of oil land into fifty or more separate leaseholds, with fixtures put up by the lessees, and from these leases received at one time an immense income, through the factorage or agency of his son, who collected in oil, or in cash, one-half of the gross avails, and was, nevertheless, largely in advance to the father. My first impression, I say, was that a person who, in the course of such dealings, obtained a credit upon negotiable paper, whether discounted for his use or not, was, in respect of such paper, a trader, though the only source and subject of his dealings might be the products of his land in their crude state. But, on further consideration (reserving the question for my own revision or that of others) I instruct you that he was not a trader. I think that the word "trader" is to be interpreted according to its meaning in the English bankrupt law. When the interpretation of the word was, in this respect, established, lands were not liable in England to be sold for their owner's debts, and the products of land were not considered subjects of trade. Nor did the intervention of a factor, and the commercial disposal of the products by him, and the accommodations which he may have extended as a banker, make his principal a trader. On this question your verdict will therefore be for the alleged bankrupt.

The other alleged act of bankruptcy is, that he has procured or suffered his property to be taken in execution with a view to prefer one or both of the creditors who sued him during his visit to Pittsburgh. The proceedings in the suits at Pittsburgh were, in form,

adversary. If they were wholly so in fact, and were neither directly nor indirectly promoted wilfully by him, or facilitated by him, with a view to an execution being issued, there was no act of bankruptcy. The only question to be considered is, whether he procured his property to be taken in execution. Here a point of law is pressed earnestly by his counsel. The creditors allege the act of bankruptcy to have consisted in procuring the executions to be levied. The point of law is founded upon an argument that the proof tends only to show that he procured the judgments to be obtained. It is objected that this is not an act of bankruptcy, and if it were one, is not the act of bankruptcy alleged. The act of congress does not make it, in itself, an act of bankruptcy for a debtor to procure a judgment to be obtained against him; but makes it an act of bankruptcy to procure his property to be taken in execution. This explains the form of the question. The answer to the objection is, that an execution is the legal purpose of a judgment, its end and fruit, as the old law books say. We can judge of men's motives and intentions only from the tendency of their acts. We cannot dive, say the books, into the secret recesses of men's hearts. But we may rationally believe that a man designs to do that to which his acts tend. Every ordinary person knows that a judgment is regularly followed by an execution; in other words, that the tendency of procuring the judgment is that the execution shall follow. If a man is tried for murder, the indictment may charge that he fired a loaded pistol at the person killed, and may not aver that the defendant was the person who loaded it. The latter averment cannot be necessary. But although there may be no direct proof that the defendant fired the pistol, yet if it was fired with fatal effect the evidence that he fired it may be circumstantial. In such a case, proof that he loaded it would not be immaterial to the question whether he fired it, and might, under some circumstances, be very material. I do not see much difference between the tendency of the judgment to produce an execution, and that of loading the pistol to produce a shot from it, except that in the former case there can be no doubt who is the intended sufferer. The objection, as a mere point of law, is thus explained and answered. But I will not state it as an absolute legal inference, that a man who procures a judgment to be obtained against himself intends that an execution shall follow. I will leave it to you, whether, in fact, this debtor, directly or indirectly, brought about or facilitated the obtaining of the judgments at Pittsburgh, with a view to their being levied by execution at Philadelphia, and with a view to preferring these two judgment creditors, or either of them.

On such a question creditors can ordinarily prove such facts only as, if unexplained, fairly authorise a reasonable inference of the

procurement and of its purpose. If such facts are proved, and the debtor, having the means of giving explanation, does not give it, the inference against him may sometimes be strengthened from the omission. If the legal proceedings appear to have resulted in anywise from arrangement between debtor and creditor who are near relatives, and the same lawyers appear to have been acting for both parties, a very full explanation from the parties who alone know the details of the transaction, has, in the course of proceedings under the bankrupt law in other cases, been thought necessary in order to rebut the inference of procurement. If the debtor goes to the creditor's lawyer, or the creditor goes to the debtor's lawyer, it is not easy to say of which of them he was counsel or attorney. Where he appears to have acted for both parties, or to have officiated between them without any distinct relation to either of them, this, if unexplained, may be evidence that the judgment was brought about by an understanding, and by the permission and connivance of the debtor. The debtor does not ordinarily go to the office of the creditor's attorney and allow service to be made on him there unless he means to promote the proceeding. These are matters for your consideration. There were two creditors, one a friend who had been for a long time very indulgent to him, the other a son. Pittsburgh was not the place of the debtor's residence, and not a place where he would, under ordinary motives, wish to be sued or would facilitate a suit against him, unless for some special purpose. It seems from the statement of his brother, who was counsel on this trial, which was received by consent as testimony, that a judgment by default can be obtained at Pittsburgh sooner than at Philadelphia, where this debtor resides, and in an easier manner. You will consider what counsel on both sides have said as to parties and certain of their companions finding their way concurrently from different places to Pittsburgh, while he was there, three hundred miles from home. I think it perhaps more important to consider what occurred there. The debtor and his son met at the law office of the debtor's brother; an account between the son and the father is there speedily adjusted, and is filed of record in the suit in which a judgment for the balance is speedily obtained. The processes were served, one in the office, and the other in the street in front of the office of the brothers, who were the lawyers. Well, gentlemen, it is for you, and not for me, to say whether all this requires explanation, and whether it has been satisfactorily explained. If you think, upon the facts, that explanation was necessary, I then say, that in law there is sufficient evidence to authorise you to think so, and to require such explanation as to satisfy you that there was no facilitation of the proceedings by the debtor amounting to the procurement alleged;

that there was no facilitation intended and effected by him. If so, how are the facts explained, if explained at all? The son has not been examined as a witness. Now it is not for me to say which party ought to have produced him as a witness. The burden of proof was upon the creditors. If they have not succeeded without his testimony in establishing a case requiring explanation, they have no right to object that he has not been examined. But if they have made out such a case, it may be proper for you to consider whether he was not the proper person from whom to expect, in great part, the explanation required. You may desire to know what induced him to go back from Pittsburgh for his books of account and bring them to Pittsburgh, where the account was settled; who told him to go for them, and why he did it. The debtor himself does not supply the omission. He appears to be a pretty candid person, but careless in his recollection. In the short time of seven months he had forgotten an interview with his son at the Monongahela House, and would not now have recollected having seen the son there if he had not been reminded of it by being shown his former deposition. He does not profess to recollect all that occurred. On the whole, if explanation was reasonably requirable, has it been satisfactorily made?

There is only one question which you can find against the bankrupt. It is whether he procured or suffered his property to be taken in execution, that is to say, wilfully facilitated it, either directly or indirectly. The other facts are not material except as evidence of the alleged procurement.

The judge then read ten written points upon which he had been requested by the counsel of the alleged bankrupt to charge the jury, and answer each of them in succession. The answers were in writing. The substance of them is in the above note of the previous charge.

The jury found for the petitioning creditors on the question whether the alleged bankrupt had procured his property to be taken in execution; and on the other questions found in his favor.